# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

WENDELL JONES,             )
                                   )
              Plaintiff,     )
                                   )
v.                                 )     No. 4:15-cv-00449-AGF
                                 )
CAROLYN W. COLVIN,     )
Acting Commissioner of Social Security,  )
                                 )
            Defendant.   )
                                 )

## MEMORANDUM AND ORDER

This action is before this Court for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Wendell Jones was not disabled

and, thus, not entitled to disability insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 401, et seq., or supplemental security income under Title XVI of the

Act, 42 §§ 1381, et seq. For the reasons set forth below, the decision of the

Commissioner shall be reversed and the case remanded for further proceedings.

Plaintiff, who was born on December 5, 1961, protectively filed applications for

disability benefits and supplemental security income on January 9, 2012, alleging an

amended disability onset date of June 16, 2011,[1] due to both mental and physical[2]

---

[1] Plaintiffs' applications initially alleged a disability onset date of February 1, 2009, but Plaintiff amended his applications to allege an onset date of June 16, 2011. (Tr. at 172, 176, 206.)

impairments.  The Social Security Administration denied Plaintiff's claims on February 3, 2012.  Plaintiff filed a request for a hearing before an administrative law judge ("ALJ") on March 23, 2012.  Following a hearing on June 18, 2013, the ALJ issued a written decision on August 19, 2013, upholding the denial of benefits.  Plaintiff then requested review of the ALJ's decision by the Appeals Council; the request was denied on January 8, 2015.  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record as a whole.  Specifically, Plaintiff argues that the ALJ failed to give proper weight to the medical opinion of Plaintiff's treating psychiatrist, Eve Lipschitz, M.D..

## BACKGROUND

### Work History and Application Forms

Plaintiff represented on his application forms that he worked from 1990 to 2008 as a bus driver, laborer, and laundry worker, with his longest employment being from 1990 to 2002 as a bus driver for a transportation company.  He indicated that he stopped working "[b]ecause of [his] condition(s)."  (Tr. 211.)

On a Function Report dated January 25, 2011, Plaintiff wrote that he lived at a homeless shelter and described his typical daily activities as "walk streets and attend groups and [doctor appointments] at VA."  (Tr. 225.)  Plaintiff reported that since his illness began to affect him, he could no longer work or maintain financial stability or

---

[2]      As Plaintiff's legal arguments relate only to his mental impairments, this Memorandum and Order does not discuss Plaintiff's physical impairments.

steady housing. He also reported that his condition affected various abilities, including memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (Tr. 226-30.)

**Medical Record**

Between June 2011 and January 2012, Plaintiff was treated by psychiatrist Antonina Gesmundo, M.D., at a Veteran's Administration ("VA") Medical Center. On June 16, 2011, Dr. Gesmundo diagnosed Plaintiff with bipolar disorder, depression, and alcohol and cocaine abuse; she observed that Plaintiff had an abnormally depressed mood and affect and that his concentration was "not good." On that date, Plaintiff denied having delusions, hallucinations, or suicidal or aggressive thoughts, and none were noted by Dr. Gesmundo. Dr. Gesmundo assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 50.[3] (Tr. 570-71.)

Dr. Gesmundo treated Plaintiff again on August 18, 2011. Plaintiff reported that his sleep was poor and that he heard voices that he could not make out, but which made him angry and sad. Plaintiff's mental status examination at this time revealed an abnormal affect and poor concentration. (Tr. 509-10.)

---

[3]     The GAF, or Global Assessment of Functioning, is a numeric scale ranging from zero to one hundred used to rate social and psychological functioning. Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. Am. Psychiatric Ass'n 1994) (DSM—VI). A GAF of 41 to 50 indicates the individual has "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . . ." *Id*. However, "[i]n recent years, the agency has recognized, and [the Eighth Circuit has] noted, that GAF scores have limited importance." *Nowling v. Colvin*, No. 14-2170, 2016 WL 690821, at *3 (8th Cir. Feb. 22, 2016).

On September 15, 2011, Plaintiff attended a "peer support" meeting at the VA Medical Center. A report from that meeting indicates that Plaintiff was relaxed and comfortable, appeared clean and neat, was cooperative, and demonstrated good hygiene. (Tr. 483.)

On October 21, 2011, Plaintiff reported to Dr. Gesmundo that he was doing better, that he remained sober from alcohol and cocaine, and that he was not as depressed. Although Plaintiff reported that his sleep was still poor and his concentration was not good, Dr. Gesmundo's form stated that Plaintiff was alert and oriented with good concentration. However, Dr. Gesmundo observed that Plaintiff's mood and affect were still abnormal, and that Plaintiff said he heard voices talking to each other. (Tr. 442-43.)

Plaintiff met with a vocational rehabilitation specialist at the VA Medical Center, Rebecca Miles, M.S.W., on December 28, 2011. Miles noted that Plaintiff's thoughts were often scattered and that he became visibly agitated when he was told he was early for his appointment. Miles also noted that Plaintiff appeared to have limited insight into his diagnoses, but that Plaintiff admittedly had not taken his medication. (Tr. 367-69.) Plaintiff also stated that he was interested in obtaining part-time work. (Tr. 370.)

On November 29, 2011, Plaintiff began weekly individual psychotherapy with Mark F. Heiland, Ph.D. Dr. Heiland had previously worked with Plaintiff in a mindfulness-based coping skills group at the VA Medical Center. Plaintiff reported struggling with racing thoughts, which made sleep especially difficult for him. He also reported a recent manic episode that lasted about a week, but said that he had been depressed for the previous several days. Plaintiff said that his psychiatric medications

had initially been helpful but were not anymore.  Dr. Heiland diagnosed Plaintiff at this time with bipolar disorder.  (Tr. 392-93.)

On January 11, 2012, Plaintiff again reported to Dr. Gesmundo that he remained sober but that his sleep was poor, his mood was depressed, his concentration was "not good," and he heard voices, though he refused to discuss them.  Dr. Gesmundo again assessed a GAF score of 50.  (Tr. 342-43.)

Plaintiff also continued seeing Dr. Heiland in January and February of 2012.  In January of 2012, Dr. Heiland observed that Plaintiff participated fully in group therapy (Tr. 353), and during a visit in February of 2012, Dr. Heiland reported that Plaintiff had good memory, but that he had disordered thoughts and was distracted.  (Tr. 712.)

On February 2, 2012, state agency psychologist Ricardo Moreno, Psy.D., completed a Psychiatric Review Technique Form assessing Plaintiff.  Dr. Moreno did not examine Plaintiff but reviewed his medical records to date.  Dr. Moreno opined that Plaintiff had mild restriction in activities of daily living, and moderate difficulties in the categories of social functioning and concentration, persistence, or pace.  Dr. Moreno assessed no episodes of decompensation and said that it appeared that Plaintiff was "capable of obtaining some simple work skills."  (Tr. 619-21.)

On the same date, Dr. Moreno completed a Mental Residual Functional Capacity Assessment.  Dr. Moreno assessed Plaintiff to have multiple moderate limitations in understanding and remembering, sustaining concentration and persistence, interacting socially, and adapting to his environment, but no marked limitations in these or any other category.  (Tr. 623-24.)  Dr. Moreno again concluded that Plaintiff appeared capable of

"performing some simple work tasks."  (Tr. 625.)  Dr. Moreno added that Plaintiff would benefit from some social restrictions and that he should avoid work with easy access to alcoholic substances.  (Tr. 625.)

On February 16, 2012, Plaintiff began treatment with VA psychiatrist, Eve Lipschitz, M.D.  Dr. Lipschitz continued to treat Plaintiff through at least April 25, 2013, and she personally evaluated Plaintiff 13 times in this 14-month period.  (Tr. 649-51, 706-14.)

During her first visit with Plaintiff on February 16, 2012, Dr. Lipschitz observed that Plaintiff insisted on wearing his winter coat indoors despite complaining that he felt too hot; he averted his eyes and intermittently peered at the doctor suspiciously; and he was "extremely suspicious" of the stress balls on the doctor's desk, would not touch or get too close to them, and kept checking to see if they had moved.  (Tr. 711-12.)  Plaintiff also reported that he heard voices—or "death angels"—that made his head hurt and would not leave him alone, and he reported consistently impaired sleep.  (Tr. 710-11.)  Although Dr. Lipschitz noted that Plaintiff had good memory and normal speech, she also observed that Plaintiff had impaired concentration and appeared to be distracted by stimuli, and that Plaintiff had a dysphoric mood, labile affect, disordered thought, and tenuous insight and judgment.  (Tr. 712-14.)   Dr. Lipschitz diagnosed Plaintiff with schizoaffective disorder, bipolar type, and a history of substance abuse, and she assessed a GAF score of 45.  (Tr. 712.)

In subsequent visits, Dr. Lipschitz noted that Plaintiff's mood and anxiety were improving and that his prescribed medication, Abilify, was helping, but she also observed

that Plaintiff's presentation was "still rather inappropriate," that Plaintiff was "most restless/fidgety," and that Plaintiff's sleep and concentration were still impaired as well. (Tr. 700-03.)

Likewise, in February and March of 2012, Dr. Heiland observed Plaintiff to have paranoid ideation, pressured speech, and tangential thoughts. (Tr. 1531, 1559.) Dr. Heiland further stated that Plaintiff's "[g]lobal social functioning [was] impaired," as he was generally fearful of others, though he was capable of developing trust with some family members and VA providers. (Tr. 1531.) Dr. Heiland noted that Plaintiff was not always fully compliant with his medications and that Plaintiff's compliance with medications was complicated by their side-effects and by Plaintiff's homelessness, but that he appeared to put forth his best effort. (Tr. 1524, 1554-55.) Dr. Heiland continued to diagnose Plaintiff with bipolar disorder until April of 2012. (Tr. 1515-16.)

On April 16, 2012, Plaintiff reported finding super glue on the street and—considering it to be a gift from God—used it to repair two of his teeth. Accordingly, Dr. Heiland assessed Plaintiff to have impaired judgment and insight, but Dr. Heiland noted that Plaintiff understood that he needed a dental appointment. (Tr. 1497-98.) Dr. Heiland changed his diagnosis of Plaintiff to schizoaffective disorder during this month. (Tr. 1485-86.)

On April 19, 2012, after learning about the super glue incident, Miles, Plaintiff's vocational rehabilitation specialist at the VA, noted that Plaintiff had "no insight into his actions." Miles also noted that Plaintiff was continuing to look for work and follow up

with job leads, but that Plaintiff was seeking jobs outside of his skills or too far away. (Tr. 1486.)

Plaintiff continued to meet with Dr. Heiland and work on coping strategies from April through May of 2012, with some progress reported. (Tr. 1462-63, 1471-73, 1481-83.)

On May 29, 2012, Plaintiff also began receiving regular psychosocial support from VA Medical Center social worker, Kendra Isadore. Isadore saw Plaintiff at least 19 times over an eight-month period. In her first visit on May 29, 2012, Isadore observed Plaintiff to have some difficulty concentrating but noted that his mental status was otherwise within normal limits. (Tr. 1444-45.)

On June 25, 2012, Isadore noted that Plaintiff had limited insight and judgment, and that he was tangential at times but otherwise appropriate. (Tr. 1384.) Likewise, in June of 2012, Dr. Heiland noted that Plaintiff still struggled with anxious and racing thoughts, but that Plaintiff appeared to respond to cognitive interventions. (Tr. 1387-89, 1409-10, 1424-25.)

On July 3, 2012, Plaintiff reported auditory hallucinations to Dr. Heiland and said that the voices sometimes told him to jump out of his window but that he did not intend to obey them. Plaintiff also reported that he hid in the bathroom for fear that people across the street were watching him. (Tr. 1354-55.)

On July 11, 2012, Dr. Lipschitz observed Plaintiff to be anxious, scattered, and dysphoric. Plaintiff reported to Dr. Lipschitz that he was wary of his new roommate and "extremely worried" about his ill sister's new caretaker, and that he was afraid to sleep

near either of them.  Plaintiff also reported that he feared retaliation from Dr. Heiland for missing an appointment with him.  Dr. Lipschitz noted that Plaintiff's guilt and psychomotor activity were increased, and that his interest, energy, and appetite were decreased.  Dr. Lipschitz increased Plaintiff's dosage of Abilify at this time.  (Tr. 690-91.)

On August 15, 2012, Plaintiff reported to Dr. Lipschitz that he blocked the door to his residence with furniture, fearing that his previous roommate would return, and sometimes slept in his bathtub to get away from the noises outside.  Dr. Lipschitz observed that Plaintiff had an abnormally anxious and dysphoric mood and affect, and vaguely paranoid delusions, and that he alluded to "seeing dragons" but would not elaborate.  Plaintiff also told Dr. Lipschitz that he had used "nail glue" to repair one of his teeth.  Dr. Lipschitz expressed concern about the safety of this act, but Plaintiff insisted he was fine.  (Tr. 683-84.)

From July through September of 2012, Dr. Heiland also noted that Plaintiff continued to have racing or irrational thoughts, pressured speech, and paranoia.  (Tr. 1196-97, 1199-1200, 1224-25, 1242-43, 1327-28.)

On September 5, 2012, Dr. Lipschitz observed that Plaintiff was anxious, dysphoric, labile, and a bit disorganized, and that his speech was "loose/tangential." Plaintiff was also very uneasy about a new roommate and planned to sleep in the lobby of Dr. Lipschitz's office.  Plaintiff's interest and concentration were decreased on this date, but his energy was normal.  (Tr. 677.)

On September 12, 2012, Dr. Heiland noted that Plaintiff continued to experience paranoid ideation and social anxiety, and Plaintiff reported that he still slept much of the night in his bathtub for privacy. However, Dr. Heiland observed that Plaintiff was willing to try social activities and that Plaintiff could interact comfortably with others when there was no perceived threat. (Tr. 1197.)

On October 24, 2012, Isadore, Plaintiff's social worker, noted that in her meeting with Plaintiff, Plaintiff exhibited some paranoia regarding his apartment managers, and Plaintiff talked throughout the entire session, with trouble concentrating and tangential and confused thinking. (Tr. 1102.) Likewise, in Plaintiff's visits with Dr. Lipschitz in October and November of 2012, Dr. Lipschitz observed Plaintiff to be anxious and apparently responding to visual hallucinations. (Tr. 673, 671.) On November 2, 2012, Dr. Lipschitz changed Plaintiff's medication to Ziprasidone. (Tr. 672.)

Thereafter, on November 21, 2012, Dr. Lipschitz noted that Plaintiff reported less trouble with hallucinations and appeared less paranoid and anxious. (Tr. 669.) On December 18, 2012, Dr. Lipschitz observed Plaintiff still to be dysphoric and anxious, but said that Plaintiff was more organized and a bit less anxious than before. (Tr. 665.)

Isadore consistently observed Plaintiff to be tangential and suspicious, with paranoia, disorganized thoughts, and limited insight and judgment in her visits with Plaintiff from October of 2012 through February of 2013. (Tr. 957, 1006, 1051, 1066, 1102.)

From February 4, 2013 through May 31, 2013, Plaintiff engaged in psychotherapy with Herbert Lomax, Ph.D. On March 4, 2013, Dr. Lomax noted that Plaintiff was

diagnosed with bipolar affective disorder and major depression, and that he did not appear to be at imminent risk of harm to himself or others.  Dr. Lomax observed Plaintiff to have decreased interest, energy, and concentration.  (Tr. 662-63.)

In February and March, 2013, Plaintiff also participated in skills classes and group discussion at the VA Medical Center, at which he was reported to appear clean and neat, to demonstrate good hygiene, to be attentive and cooperative, and to be, at times, talkative.  (Tr. 903, 912, 920, 935, 939.)

After an extended personal leave of absence, Dr. Lipschitz treated Plaintiff again on March 25, 2013.  Plaintiff reported continuing auditory hallucinations and paranoia, but declined a medication increase.  Dr. Lipschitz observed Plaintiff to have decreased interest, energy, concentration, and psychomotor activity.  Dr. Lipschitz's diagnoses of Plaintiff as of this date were schizoaffective disorder, and polysubstance dependence in sustained full remission.[4]  (Tr. 657-61.)

On April 4, 2013, Dr. Lomax noted that Plaintiff appeared to be sad due to the illness of his sister, that Plaintiff responded to inquiry in monosyllables, and that Plaintiff reported side effects of drowsiness and lethargy due to a change in his psychotropic medications.  Dr. Lomax also observed Plaintiff to have decreased interest, energy, and concentration.  Dr. Lomax added that Plaintiff voiced willingness to go to the emergency room in the event of a crisis.  (Tr. 652-53.)

---

[4]     Plaintiff tested positive for cocaine on June 26, 2012, but his drug screens for the next 11 months were negative.  (Tr. 723.)

Dr. Lipschitz last treated Plaintiff on April 25, 2013. (Tr. 649-51.) At that time, Dr. Lipschitz observed Plaintiff to have decreased energy, interest, concentration, and psychomotor activity. (Tr. 650.) However, Plaintiff reported that his auditory hallucinations had quieted on the Ziprasidone. (Tr. 651.)

Plaintiff continued to visit Dr. Lomax in May 2013. On May 7, 2013, Dr. Lomax noted that Plaintiff had been compliant with his psychotropic medications, which Plaintiff considered beneficial in symptom management. (Tr. 648.) Likewise, on May 31, 2013, Dr. Lomax noted that Plaintiff's mood and affect appeared to be stable on that day and that Plaintiff seemed more optimistic than in previous presentations. (Tr. 647.) But Dr. Lomax added that Plaintiff was prone to suicidal ideations during periods of excessive stress, and in both of these May 2013 appointments, Dr. Lomax continued to note that Plaintiff had decreased interest, energy, and concentration. (Tr. 646-68.)

On June 4, 2013, Dr. Lipschitz completed a mental medical source statement on behalf of Plaintiff. In her medical source statement, Dr. Lipschitz found that, within the category of activities of daily living, Plaintiff had marked limitations in coping with normal work stress and behaving in an emotionally stable manner, and a moderate limitation in functioning independently. (Tr. 719.) In the category of social functioning, Dr. Lipschitz found that Plaintiff had a marked limitation in accepting instructions and responding to criticism and moderate limitations in relating in social situations, interacting with the general public, and maintaining socially acceptable behavior. *Id.* In the category of concentration persistence, and pace, Dr. Lipschitz found that Plaintiff had marked limitations in maintaining attention to work tasks for up to two hours, performing

at a consistent pace, sustaining an ordinary routine without special supervision, responding to changes in work setting, and working in coordination with others; and that Plaintiff had moderate limitations in understanding and remembering simple instructions and making simple work-related decisions. (Tr. 720.) Dr. Lipschitz wrote that she believed Plaintiff's work would be interrupted two to three times per week due to his impairments. *Id.*

As part of her medical opinion, Dr. Lipschitz also provided a narrative explanation for her diagnoses of Plaintiff's mental impairments. She wrote that Plaintiff had spells of low and high mood, along with psychotic symptoms such as paranoia and auditory and visual hallucinations, all of which interfered with his personal relationships and his ability to maintain gainful employment. (Tr. 721.)

**Evidentiary Hearing of June 18, 2013 (Tr. 67-94)**

The ALJ held a hearing in this matter on June 18, 2013. Plaintiff testified and was represented by counsel. Tracy Young, a vocational expert, also testified at the hearing. (Tr. 88.)

**1.      Plaintiff's testimony (Tr. 78-88)**

At the time of the hearing, Plaintiff was 51 years old and living in transitional housing for homeless veterans with a roommate. Plaintiff testified that he had obtained a GED. Plaintiff reviewed his work history as a bus driver, janitor, fast foods worker, laundry worker, landscape laborer, and warehouse worker. He testified that he had one DUI and that he had treatment for alcohol abuse.

Plaintiff testified that he sometimes went into depression, tended to isolate, and could not focus. He testified that he had "episodes," in which he lost track of time, forgot to take his medicine, and sometimes hid his medicine and then lost it. (Tr. 82.) He stated that he attended stress management and anger management groups as recommended by his treatment providers. Plaintiff further testified that he kept to himself and avoided his roommate. He only slept two to three hours each night, and he sometimes slept in the bathtub, with a chair in front of the bathroom door, to block outside noises.

### 2.    Testimony of Vocational Expert (Tr. 88-93)

The ALJ asked the VE whether Plaintiff could perform any of his past relevant work, given that he was functionally limited to unskilled, medium exertional work and that he should avoid ropes, ladders, scaffolding, and hazardous heights. The VE testified that, with those limitations, Plaintiff could perform his past relevant work as a housekeeping cleaner, fast foods worker, warehouse worker, and laundry worker.

The ALJ also asked the VE to provide three additional jobs that a hypothetical individual with the same education, vocational background, and residual functional capacity as Plaintiff has the ability to perform and that exist in significant numbers on a regional and national level. The VE testified that such an individual could perform the jobs of dishwasher, automobile detailer, and automatic car wash attendant, which exist in significant numbers in the national economy.

Plaintiff's attorney altered the hypotheticals in his questioning of the VE. Plaintiff's attorney asked the VE to consider hypothetical individual also limited to medium exertional work, but with marked limitations—defined as seriously inferring

with the ability to function independently, appropriately, and effectively—in coping with normal work stress, behaving in an emotionally stable manner, accepting instructions, responding to criticism, and maintaining attention to work tasks for up to two hours. Plaintiff's attorney asked the VE to assume that this individual exhibited these marked limitations 20% of the time during an eight-hour day. The VE testified that, for such an individual, work would be precluded.

**ALJ's Decision of August 19, 2013** (Tr. 14-22)

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since June 16, 2011, the amended alleged disability onset date. The ALJ found that Plaintiff had several severe medically determinable impairments, including depression, anxiety, and a history of alcohol abuse, but that no impairment or combination of impairments met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

After considering the entire record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a range of medium exertional work, and that Plaintiff could understand, remember, and carry out at least simple instructions and non-detailed tasks. The ALJ found, based on the testimony of the VE, that Plaintiff could perform past relevant work as a housekeeper, fast-food worker, warehouse worker, and laundry worker; and that there are other jobs existing in significant numbers in the national economy that Plaintiff could also perform, such as dishwasher, automobile detailer, and automatic car wash attendant. The ALJ asserted that Plaintiff's attorney "presented vocational hypotheticals [to the VE] based on facts not in evidence or

allegations not supported by the longitudinal record." (Tr. 22.) Thus, the ALJ concluded that Plaintiff had not been under a disability from June 16, 2011 through the date of the decision.

In making her findings, the ALJ gave "little weight" to Dr. Lipschitz's opinion for two stated reasons: first, because the opinion was "not from [a] treating medical source[]," and second, because "the severity of the limitations [noted in the opinion] seems to contradict the limitations expressed in the treatment notes from the Veteran's Administration Medical Center, the claimant's treating source." (Tr. 14.)

By contrast, the ALJ gave "great weight" to the opinion of state agency psychologist, Dr. Moreno, finding that Dr. Moreno's opinion was consistent with Plaintiff's treatment records.

The ALJ's decision made no mention of Dr. Lipschitz's treatment records. The ALJ did, however, summarize treatment records of Dr. Gesmundo, Dr. Heiland, Ms. Isadore, and Dr. Lomax. The ALJ also referenced records from Plaintiff's participation in vocational rehabilitation, skills classes, and group discussion at the VA Medical Center.

The ALJ noted that Dr. Gesmundo observed Plaintiff to have no suicidal ideation, but to be suffering from poor sleep, abnormal mood and affect, and poor concentration. The ALJ also noted that Plaintiff reported hallucinations to Dr. Gesmundo, though he refused to discuss them, and that Dr. Gesmundo assessed Plaintiff with a GAF score of 50. As to Dr. Heiland, the ALJ noted that his treatment records reflected that Plaintiff participated fully in group therapy and denied any clinically significant suicidal or

homicidal ideation.  Next, the ALJ noted that Ms. Isadore observed that Plaintiff was

anxious, had a slight affect, was distracted, and had little insight into the validity of his

hallucinations.  Finally, the ALJ noted that Dr. Lomax stated on one occasion that

Plaintiff had a stable mood and affect, and that Plaintiff reported being compliant with

medications, which Plaintiff said were beneficial in managing his symptoms.

The ALJ considered Dr. Lipschitz's mental medical source opinion.  The ALJ

accorded little weight to Dr. Lipschitz's opinion because she found that it was

inconsistent with other evidence in the record.  First, the ALJ found that Dr. Lipschitz's

opinion that Plaintiff had marked limitations in coping with normal work stress and

accepting instructions was contradicted by records of Plaintiff's participation in

vocational rehabilitation, skills classes, and group discussion at the VA Medical Center,

which at various times noted that Plaintiff was seeking work, had good hygiene and

appropriate dress, and was clean and neat.  The ALJ also found that Dr. Lipschitz's

opinion that Plaintiff had marked limitations in behaving in an emotionally stable

manner, responding to changes, and working in coordination with others was

contradicted by VA Medical Center records observing that Plaintiff was cooperative and

talkative in group discussion.  Finally, the ALJ found that Dr. Lipchitz's opinion that

Plaintiff had marked limitations in performing at a consistent pace and sustaining an

ordinary routine without supervision was not supported by Plaintiff's treatment records,

which the ALJ asserted made no mention of memory deficit.

## DISCUSSION

## Standard of Review and Statutory Framework

The Court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. *Pate–Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). A court should "disturb the ALJ's decision only if it falls outside the available zone of choice." *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015) (citation omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). A special technique is used to determine the severity of mental disorders. This technique calls for

rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* § 404 .1520a(c)(3).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in the Commissioner's regulations. If not, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work. If so, the claimant is not disabled. If he cannot perform his past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors—age, education, and work experience. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).

## Opinion of Plaintiff's Treating Psychiatrist

Plaintiff argues that the ALJ failed to properly weigh the opinion evidence from his treating psychiatrist, Dr. Lipschitz. Specifically, Plaintiff argues that the ALJ erred by incorrectly finding that Dr. Lipschitz was not a treating medical source and by finding that Dr. Lipschitz's opinion was inconsistent with the remainder of the record. In response, the Commissioner concedes that the ALJ "overlook[ed]" that Dr. Lipschitz was a treating medical source but argues that the inconsistencies between Dr. Lipschitz's opinion and the remainder of the record, which were noted by the ALJ, provided

sufficient basis for the ALJ to reject Dr. Lipschitz's opinion. Upon review, the Court agrees with Plaintiff that the ALJ erred in evaluating the opinion of Dr. Lipschitz, and the Court will reverse and remand this case for further consideration of Dr. Lipschitz's opinions.

"The ALJ must give controlling weight to a treating physician's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Papesh*, 786 F.3d at 1132. "Not inconsistent . . . is a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." S.S.R. 96-2p, Policy Interpretation Ruling, Titles II & XVI: Giving Controlling Weight to Treating Source Med. Opinions, 1996 WL 374188, at *3 (July 2, 1996).

"Even if the treating physician's opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." *Papesh*, 786 F.3d at 1132 (citation omitted). "It may have limited weight if it provides conclusory statements only, or is inconsistent with the record." *Id.* (citations omitted). For example, the ALJ "may discount or even disregard the opinion . . . where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015).

Whatever weight the ALJ accords the treating physician's report, the ALJ is required to give good reasons for that weighting. *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001). The ALJ is not required to discuss every piece of evidence submitted. *See Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998). But if the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider the following factors in determining what weight to give the opinion: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered, and (6) other factors which may contradict or support the opinion. *Constable v. Colvin*, No. 4:14 CV 1128 CDP, 2015 WL 5734977, at *15 (E.D. Mo. Sept. 29, 2015); 20 C.F.R. § 404.1527(c)(2)-(6).

Here, the ALJ gave two reasons for giving little weight to Dr. Lipschitz's opinion: first, because the opinion was "not from [a] treating medical source[]," and second, because "the severity of the limitations [noted in the opinion] seems to contradict the limitations expressed in the treatment notes from the Veteran's Administration Medical Center, the claimant's treating source." (Tr. 14.)

The first reason is erroneous, as the Commissioner concedes that Dr. Lipschitz is a treating medical source. In light of this error, it is difficult for the Court to determine what weight, if any, the ALJ would have given to Dr. Lipschitz's opinion if she had

properly considered Dr. Lipschitz to be a treating medical source. Remand for further consideration of Dr. Lipschitz's opinion is thus appropriate. *See Torres v. Astrue*, No. 11-CV-0144-NKL-SSA, 2012 WL 123057, at *5 (W.D. Mo. Jan. 17, 2012) ("Because the ALJ was confused about the source of this medical opinion, it is impossible for the Court to determine what weight, if any, the ALJ would have given to that opinion if he correctly attributed it. Remand is thus appropriate on this point.") (citation omitted).

As to the second reason, the Court is unconvinced that the ALJ's explanation of inconsistencies between Dr. Lipschitz's opinion and VA Medical Center treatment notes by other providers is based on a full and fair consideration of the record.

The ALJ's decision made no mention of Dr. Lipschitz's treatment records, but as Plaintiff correctly notes, these records appear to support Dr. Lipschitz's opinion. Dr. Lipschitz personally evaluated Plaintiff 13 times in a 14-month period, and consistently noted that Plaintiff's concentration was impaired or decreased and that Plaintiff appeared to be paranoid, anxious, and scattered. Dr. Lipschitz also observed on several occasions that Plaintiff appeared to be responding to internal stimuli or hallucinations, and that Plaintiff exhibited abnormal behavior, mood, and affect.

Additionally, as Plaintiff correctly asserts, Dr. Lipschitz's opinion is largely consistent with the treatment records of Dr. Gesmundo, Dr. Heiland, Ms. Isadore, and Dr. Lomax. Even as summarized by the ALJ, Dr. Gesmundo and Ms. Isadore's records of Plaintiff's hallucinations, abnormal affect, and poor concentration appear to be consistent with Dr. Lipschitz's opinion. Likewise, as noted above, although Dr. Heiland did observe that Plaintiff participated fully in group therapy in January of 2012, in later visits,

Dr. Heiland observed Plaintiff to exhibit tangential thoughts, pressured speech, paranoid ideation, poor judgment and insight, and impaired global social functioning. These records appear to be consistent with, or at least not contradictory to, Dr. Lipschitz's opinion. Finally, although Dr. Lomax on one occasion observed that Plaintiff's mood and affect seemed stable and that Plaintiff had been compliant with his medication, Dr. Lomax also observed that Plaintiff had decreased concentration in each of his visits. Thus, Dr. Lomax's records do not appear to contradict Dr. Lipschitz's opinion.

Finally, a review of the record as a whole shows that the treatment notes regarding Plaintiff's participation in skills classes and group discussion at the VA Medical Center, which were relied on by the ALJ, do not necessarily contradict or conflict with Dr. Lipschitz's opinion. The evidence cited by the ALJ that Plaintiff on occasion sought work, had good hygiene, dressed appropriately, had no memory deficit, and was cooperative and talkative, in light of the record as a whole, does not appear to be so inconsistent with Dr. Lipschitz's opinion as to support the ALJ's decision to accord that opinion little weight.

As Plaintiff correctly notes, the primary medical evidence of record that was directly contrary to Dr. Lipschitz's opinion was the opinion of state non-examining psychologist, Dr. Moreno, who opined that Plaintiff had non-disabling limitations and to whose opinion the ALJ gave "great weight." The Commissioner argues that if the ALJ had good cause to reject Dr. Lipschitz's opinion, it was appropriate for the ALJ to rely on the alternate medical opinion from the non-treating source, Dr. Moreno.

"Normally, the opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not constitute substantial evidence on the record as a whole." *Constable*, 2015 WL 5734977, at *17 (citing *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003)). "Although the opinions of nonexamining sources may be considered, they are generally given less weight than those of examining sources." *Id.* (citing *Wildman v. Astrue*, 596 F.3d 959, 967 (8th Cir. 2010); 20 C.F.R. § 404.1527(c)(1)). In evaluating nonexamining source opinions, the ALJ must "evaluate the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources." 20 C.F.R. § 404.1527(d)(3); *see also id*. § 404.1527(f) (discussing rules for evaluating nonexamining state agency opinions).

In *Wildman*, in determining that the ALJ properly disregarded the state agency psychologists' opinions from 2003 and 2004, the Eighth Circuit found it "significant that the state agency evaluators did not have access to medical records from 2005 and 2006." *Wildman*, 596 F.3d at 967. Here, too Dr. Moreno's opinion was issued on February 2, 2012, before Plaintiff's first consultation with Dr. Lipschitz, so Dr. Moreno did not have access to Dr. Lipschitz's treatment records. Moreover, it is difficult for the Court to determine what weight, if any, the ALJ would have accorded Dr. Moreno's opinion if she had properly considered Dr. Lipschitz a treating medical source and weighed her opinion accordingly. On remand, the ALJ should reconsider and weigh Dr. Moreno's opinion in accordance with the law and precedent discussed above.

## CONCLUSION

In sum, the Court finds the ALJ failed to properly evaluate the weight to accord the opinions of treating psychiatrist, Dr. Lipschitz, and therefore her decision was not supported by substantial evidence on the record. Upon remand, the ALJ must either give Dr. Lipschitz's opinion controlling or substantial weight, or provide an acceptable reason listed in in 20 C.F.R. § 404.1527 as to why Dr. Lipschitz's opinion deserves less weight.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED and the case is REMANDED** to the Commissioner for further development of the record. A separate judgment will accompany this Order.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 24th day of February, 2016.